James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
4500 East Pacific Coast Highway, Fourth Floor
Long Beach, CA 90804
Telephone: (562) 391-2487
Facsimile: (415) 477-6710
Email: gnecf@classcounsel.com

Robert S. Green (State Bar No. 136183)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email: gnecf@classcounsel.com

*Attorneys for Plaintiffs*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA SEWARD, BRIAN M. BRADY, and CONNIE BRADY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No.: 5:19-cv-960<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMAND** |

Plaintiffs Joshua Seward, Brian M. Brady, and Connie Brady (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel, bring this action against Defendant WELLS FARGO BANK, NA ("Wells Fargo" or "Defendant"), and for their Class Action Complaint state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Joshua Seward ("Mr. Seward") is a natural person residing in Isanti, Minnesota.

2.    Plaintiffs Brian M. Brady and Connie Brady (collectively, the "Bradys") are natural persons residing in Corona, California.

3.    Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") is a business incorporated under the laws of the State of Delaware.  Defendant maintains its principal place of business at 420 Montgomery Street, San Francisco, California 94104.  Defendant does business in the state of California and nationwide.

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because Plaintiffs believe the amount in controversy in this matter exceeds $5,000,000 and because Plaintiffs and members of the putative Class are from different states than Defendant.

5.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because the Bradys are residents of this District, and a substantial part of the events or omissions giving rise to Plaintiffs' and Class members' claims occurred in this District.

## STATEMENT OF FACTS

### *Loan Modification Programs*

6.    In light of the 2007-2008 financial crisis, the federal government implemented programs designed to provide relief to mortgage loan borrowers who could no longer afford to make payments on their mortgage loans.  Some of those

00110828.000.docx

programs—such as the Home Affordable Modification Program, and other similar programs implemented by the Federal Housing Administration, Fannie Mae, and Freddie Mac—provide eligible homeowners with the opportunity to modify the terms of the mortgages so as to make them more affordable ("Modification Programs").

7.     Under the applicable guidelines for those Modification Programs, participating mortgage loan servicers ("Servicers")—such as Wells Fargo—are required to evaluate borrowers' eligibility for loan modifications ("Loan Modifications"). These eligibility requirements include a borrower's financial hardship, continued employment, income level, lack of prior Loan Modifications, etc.

8.     If a borrower is determined to be eligible for a Loan Modification, a Servicer may place that borrower into a "Trial Period Plan" ("TPP") before the Loan Modification becomes permanent. Under the terms of a TPP, a borrower is required to make "trial" mortgage payments over a period of three months. The amount of those "trial" payments is derived from the modified mortgage payment a borrower would have to make if the borrower's Loan Modification is ultimately approved.

9.     If a borrower makes all required "trial" payments pursuant to the terms of a TPP and experiences no change relative to the other Modification Program eligibility requirements, then the borrower will be approved for a permanent Loan Modification. Essentially, TPPs allow eligible homeowners to demonstrate that they will be able to make the modified monthly payments once their Loan Modifications become permanent.

10.     Given that a borrower must meet Modification Program eligibility requirements to be placed in a TPP, courts have routinely held that Servicers have a contractual obligation to approve a permanent Loan Modification upon successful completion of a TPP—*i.e.*, once a borrower makes all payments

1
2
3
required under a TPP.  *See generally*, *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012).

4
5
6
7
8
9
11.    Since Loan Modifications change the terms of existing mortgages, there is a risk that a Loan Modification will cause an existing, superior lien to become subordinate to other liens on a given property.  As such, the guidelines for Modification Programs require Servicers to ensure that modified mortgages remain in a first lien position after a Loan Modification is completed (the "Subordination Process").

10
11
12
13
14
15
12.    However, ensuring that a modified mortgage remains in a first lien position after a Loan Modification is easier said than done.  The Subordination Process usually extends beyond the initial three-month term of a TPP, which requires Servicers to extend the terms of borrowers' TPPs for several additional months.  Even then, subordinate lienholders oftentimes refuse to agree to subordinate their existing liens to a modified mortgage.

16
17
18
19
13.    Since Modification Programs require that modified mortgages remain in a first lien position after a Loan Modification is completed, if a subordinate lienholder refuses to subordinate its existing lien to a modified mortgage, then a borrower's Loan Modification will be denied.

20
### *Wells Fargo's Loan Modifications*

21
22
23
24
14.    At all times relevant to this action, Wells Fargo agreed to take part in the Modification Programs established by federal mortgage lenders such as the Federal Housing Administration, Fannie Mae, Freddie Mac and under the Making Homes Affordable Program of the Troubled Asset Relief Program.

25
26
27
15.    At all times relevant to this action, Wells Fargo was the Servicer of Plaintiffs' and Class members' notes, and mortgages on real property that secured those notes (collectively referred to hereinafter as the "mortgages").

28

16.     Plaintiffs and Class members sought to avail themselves of the Modification Programs offered by Wells Fargo relative to their mortgages, and they either applied for Loan Modifications from Wells Fargo or were offered "streamlined" modifications without application or underwriting. Both underwritten and streamlined modifications required that the borrowers make trial payments before being given permanent Loan Modifications.

17.     When Plaintiffs and Class members applied for Loan Modifications, they met all eligibility requirements necessary to enter into the Modification Programs offered by Wells Fargo relative to their mortgages.

18.     When Plaintiffs and Class members applied for Loan Modifications, they were unaware that they could be denied permanent Loan Modifications if the Subordination Process failed—*i.e.*, if subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages.

19.     Pursuant to the terms of the Modification Programs, Wells Fargo determined that Plaintiffs and Class members were eligible for Loan Modifications.  Accordingly, Wells Fargo sent Plaintiffs and Class members letters stating that they had met all eligibility criteria relative to the Modification Programs for which they applied.

20.     Since Plaintiffs and Class members were eligible for Loan Modifications, Wells Fargo offered to place Plaintiffs and Class members into TPPs.  Pursuant to the terms of those TPPs, Wells Fargo agreed to give Plaintiffs and Class members permanent Loan Modifications upon Plaintiffs' and Class members' successful completion of their TPPs—*i.e.*, once they made all payments required under the TPPs—assuming that their predetermined eligibility status remained unchanged.

21.     At the time Wells Fargo offered to place Plaintiffs and Class members into TPPs, Wells Fargo knew of the necessity of the Subordination

00110828.000.docx

Process relative to permanent Loan Modifications and that Plaintiffs' and Class members' Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages.  Wells Fargo also knew that the loan subordination requirement was not an eligibility criterion of the Modification Programs for which Plaintiffs and Class members applied.

22.    Since the denial of Plaintiffs' and Class members' permanent Loan Modifications would frustrate the entire purpose of their TPPs, the fact that Plaintiffs' and Class members' Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages was a material fact to Plaintiffs and Class members.

23.    Wells Fargo misrepresented to Plaintiffs and Class members the material terms of the TPPs by stating that it would give Plaintiffs and Class members permanent Loan Modifications upon Plaintiffs' and Class members' successful completion of their TPPs—*i.e.*, once they made all payments required under the TPPs—assuming their predetermined eligibility status remained unchanged.  As such, Plaintiffs and Class members remained unaware that their Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages, and they believed that the material terms of their TPPs were as Wells Fargo had represented them to be.

24.    Plaintiffs and Class members reasonably believed that they were eligible for the Loan Modifications that they requested and that those Loan Modifications would become permanent once they made all payments required by their TPPs. Based upon that reasonable belief, Plaintiffs and Class members entered into TPPs with Wells Fargo.

25.    The fact that Plaintiffs' and Class members' Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages was not a term of the TPPs into which Plaintiffs and Class members entered with Wells Fargo. Rather, Wells Fargo affirmatively

represented that their Loan Modifications would become permanent once they made all payments required by their TPPs (assuming their predetermined eligibility status remained unchanged).

26.     Plaintiffs and Class members made all modified mortgage payments pursuant to the terms of their TPPs, and continued to meet all eligibility requirements of the Modification Programs for which they applied.  As such, Plaintiffs and Class members fully performed their obligations under their TPPs and were contractually entitled to permanent Loan Modifications.

27.     Plaintiffs and Class members never received permanent Loan Modifications because subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages.  As a result, Plaintiffs and Class members were denied permanent Loan Modifications.

28.     After Plaintiffs and Class members made all modified mortgage payments pursuant to the terms of their TPPs, Wells Fargo sent letters to Plaintiffs and Class members informing them that they had been denied permanent Loan Modifications ("Denial Letters").

29.     In the Denial Letters, Wells Fargo stated that Plaintiffs and Class members did not meet the requirements of the Modification Programs for which they applied.  As such, Plaintiffs and Class members believed that their predetermined eligibility status had changed, and that this was the reason that their permanent Loan Modifications were denied.  Because Wells Fargo was the sole entity responsible for determining Plaintiffs' and Class members' eligibility for Modification Programs, Plaintiffs and Class members reasonably relied on Wells Fargo's representations that their Loan Modifications were denied because there was a change in their predetermined eligibility for the Loan Modifications they requested.

30.     However, the successful completion of the Subordination Process was not a part of the agreements between Wells Fargo and Plaintiffs and Class

00110828.000.docx

1   members.  As such, there had been no change in Plaintiffs' and Class members'

2   predetermined eligibility status, contrary to the representations in the Denial

3   Letters Wells Fargo sent to Plaintiffs and Class members.

4        31.    Since Plaintiffs and Class members had experienced no change in

5   their predetermined eligibility status relative to the Modification Programs for

6   which they applied and they made all payments required pursuant to the terms of

7   their TPPs, Wells Fargo breached the terms of the TPPs into which Plaintiffs and

8   Class members entered.

9        32.    Plaintiffs and Class members were unaware of Wells Fargo's

10  breaches of the TPPs because, in the Denial Letters, Wells Fargo represented that

11  Plaintiffs and Class members did not meet the eligibility requirements of the

12  Modification Programs for which they applied.  Put another way, Plaintiffs and

13  Class members believed that *they* were the parties responsible for not fulfilling the

14  terms of the TPPs, and that their Loan Modifications were denied because of their

15  own failure to meet the eligibility requirements of the Modification Programs for

16  which they applied.

17       33.    For similar reasons, Plaintiffs and Class members were unaware that

18  Wells Fargo misrepresented the material terms of their TPPs.  By representing that

19  the denials of Plaintiffs' and Class members' permanent Loan Modifications were

20  predicated upon a change in their predetermined eligibility status in the Denial

21  Letters Wells Fargo sent to Plaintiffs and Class members, Wells Fargo actively

22  concealed the fact that it had misrepresented the material terms of the TPPs to

23  Plaintiffs and Class members.

24       34.    Had Plaintiffs and Class members been aware that the Loan

25  Modifications that they requested would be denied if subordinate lienholders

26  refused to subordinate their existing liens to the modified mortgages, they would

27  not have agreed to enter into TPPs with Wells Fargo. The necessity of the

28  Subordination Process was a material term to Plaintiffs and Class members.

35.     As a direct and proximate result of Wells Fargo's misrepresentations concerning the terms of the TPPs and the necessity of the Subordination Process, Plaintiffs and Class members were harmed because they entered into the TPPs, and made payments pursuant to the terms of those TPPs, under the false impression that they were, and would remain, eligible for permanent Loan Modifications and that their Loan Modifications would become permanent if they made all payments required by their TPPs.

36.     Plaintiffs and Class members were also harmed because, by virtue of making payments pursuant to the terms of their TPPs, they reset the applicable statutes of limitations relative to the collectability of those debts.

37.     Additionally, Plaintiffs and Class members suffered emotional damages related to the fact that they believed they had completed all prerequisites necessary to save their homes from being foreclosed upon, but then had the rug pulled out from under them by Wells Fargo when they were subsequently informed that those efforts were insufficient.

38.     Plaintiffs, individually, and on behalf of the Class, seek recovery of the damages they incurred as a result of Wells Fargo's breach of contract and misrepresentations regarding the material terms of Plaintiffs' and Class members' TPPs.  Plaintiffs, individually, and on behalf of the Class, also seek injunctive and declaratory relief to nullify the effect of the payments they made pursuant to the terms of their TPPs on the collectability of the debts secured by their mortgages.

39.     Recently, Wells Fargo has been mailing letters ("Settlement Letters") with a check enclosed to Plaintiffs and Class members stating: "We had previously approved this loan for a modification trial plan, but the loan was subsequently removed from home preservation prior to the final modification.  We should have let you know at the time of trial approval that the modification might be denied due to title issues even if you paid the trial period payments…We've enclosed a check for $300.00 to fully settle this issue."

40.     However, the $300.00 offered by Wells Fargo in its Settlement Letters does not come close to adequately compensating Plaintiffs and Class members for the damages they incurred as a result of Wells Fargo's conduct.

41.     When Plaintiffs and Class members received the Settlement Letters from Wells Fargo, it was the first time they became aware that Wells Fargo had breached the terms of their TPPs, and had actively concealed the fact that it had misrepresented the material terms of the TPPs to Plaintiffs and Class members. Up until that point, Plaintiffs and Class members believed that they had been denied permanent Loan Modifications because they experienced a change in their predetermined eligibility status relative to the Modification Programs for which they applied, and that Wells Fargo's representations regarding the terms of the TPPs were accurate.

42.     Given that Wells Fargo was aware of its misrepresentations and contractual breaches concerning the material terms of the TPPs it entered into with borrowers and, as a result, changed the language in its TPPs in 2013 or 2014, the recency of the Settlement Letters evidences an ongoing, intentional effort to conceal its violations from Plaintiffs and Class members. Put another way, Wells Fargo intentionally waited to reveal the problem until the potential remedies to the Plaintiffs and Class members were limited by the passage of time.

43.     Since they had previously entered into TPPs with Wells Fargo, Wells Fargo knows that Plaintiffs and members of the Class were, and continue to be, in a difficult financial situation.  Wells Fargo is also aware of many Class members' difficult financial situations because those Class members are still customers of Wells Fargo.  Due to their financial circumstances, many Class members, like Plaintiffs, desire to cash the checks enclosed with the Settlement Letters they received.

44.     For these reasons, Wells Fargo knows that Class members would be more likely to accept pennies on the dollar to waive any claims they may have

CLASS ACTION COMPLAINT

against Wells Fargo.  This is compounded by the fact that Class members are unlikely to remember the exact amount of money they paid to Wells Fargo pursuant to the terms of their TPPs, and therefore would rely upon Wells Fargo's unilateral calculation as an accurate computation of their damages.  Accordingly, Class members are likely to believe that Wells Fargo's $300.00 payment is fair offer, and would not be aware that they are accepting such a measly sum.

45.     In addition, since Class members were denied permanent Loan Modifications, many of them have already had their homes foreclosed upon years ago, and have no idea that they may be able to revisit any issues arising out of that process.  For the same reason, most Class members have terminated their relationships with counsel who represented them in their foreclosure proceedings. This is particularly dangerous because Class members—as debtors—belong to a "particularly vulnerable group" and are likely to be "of below average sophistication or intelligence" and "uninformed or naïve."  *See, e.g.*, *Gonzales v. Arrow Fin. Services, LLC*, 660 F.3d 1055, 1062 (9th Cir. 2011).

46.     As such, many Class members will view the checks enclosed with the Settlement Letters as an act of generosity on the part of Wells Fargo, would be unaware of the legal implications of cashing those checks, and would be unlikely to consult with counsel regarding those legal implications.  Moreover, even if they are aware of the implications of cashing the checks enclosed with the Settlement Letters, many Class members would feel pressure to accept Wells Fargo's "settlement offer" because (as was the case in *Kleiner*) they, *inter alia*, (1) have an existing financial relationship with Wells Fargo (*e.g.*, Wells Fargo still services their mortgages), (2) are current customers of Wells Fargo (*e.g.*, they have a credit card or bank account with Wells Fargo), (3) may require accommodations from Wells Fargo relative to the terms of existing lines of credit, due to their difficult financial circumstances (*e.g.*, they may request another Loan Modification), or (4) may need to depend on Wells Fargo to obtain credit in the future—especially if

they are unable to obtain credit from other lenders due to their credit history and financial situations—and would want to maximize the chance that they can obtain credit and secure the best possible terms relative to the extension of that credit. *See, e.g.*, *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985) ("The class consisted of bank borrowers, many of whom were dependent on the bank for future financing. Bank customers affected by the litigation included those who anticipated seeking a note rollover, new loans, extension of lines of credit, or any type of discretionary financial indulgence from their loan officers, and who did not have convenient access to other credit sources.") (internal quotations omitted).

47.   In light of the foregoing, the Settlement Letters are an unduly coercive act on the part of Wells Fargo, as Wells Fargo knows that it is taking advantage of Class members' difficult financial situations and that Class members are unlikely to be aware of "what they are possibly giving up" by cashing the checks enclosed with the Settlement Letters. *Friedman v. Intervet Inc.*, 730 F.Supp.2d 758, 763 (N.D. Ohio 2010) (collecting cases).

48.   For these reasons, two plaintiffs in adversary proceedings pending in the United States Bankruptcy Court for the Southern District of New York filed a joint motion for a preliminary injunction against Wells Fargo seeking an order that would enjoin Wells Fargo from sending misleading communications with settlement offers to borrowers and enforcing any purported settlement or waiver of borrowers' rights to recover damages from Wells Fargo in the event they cash the checks that Wells Fargo sent with the Settlement Letters.  *See*, *Reyes v. Wells Fargo Bank, N.A.*, Dkt. # 5, Adversary Case No. 19-08248-shl (Bankr. S.D.N.Y); *Jackson v. Wells Fargo Bank, N.A.*, Dkt. # 5, Adversary Case No. 19-08249-shl (Bankr. S.D.N.Y).  Although Wells Fargo entered into a stipulated Order granting the relief sought in that motion, that Order only applies to borrowers in the Southern District of New York.  *See*, *Reyes v. Wells Fargo Bank, N.A.*, Dkt. # 13,

1  Adversary Case No. 19-08248-shl (Bankr. S.D.N.Y); *Jackson v. Wells Fargo*

2  *Bank, N.A.*, Dkt. # 13, Adversary Case No. 19-08249-shl (Bankr. S.D.N.Y).

3      49.    Accordingly, Plaintiffs, individually, and on behalf of the Class,

4  intend to seek preliminary equitable and declaratory relief to (1) prevent Wells

5  Fargo from sending misleading and coercive communications with settlement

6  offers to absent Class members, (2) require Wells Fargo to provide corrective

7  notice to Class members who received Settlement Letters, and/or (3) ensure that

8  Plaintiffs and Class members from across the country do not waive their right to

9  recover damages in this action in the event they cash the checks that Wells Fargo

10 sent with the Settlement Letters.

## FACTS RELATIVE TO PLAINTIFFS

### *Mr. Seward*

13     50.    At all times relevant to this action, Wells Fargo was the Servicer of

14 Mr. Seward's mortgage.

15     51.    In June or July 2012, Mr. Seward submitted a complete application to

16 Wells Fargo to avail himself of a Loan Modification.

17     52.    When Mr. Seward applied for his Loan Modification, he met all

18 eligibility requirements of that Modification Program.  Accordingly, Wells Fargo

19 sent Mr. Seward a letter stating that he had met all eligibility criteria relative to the

20 Modification Program for which he applied.

21     53.    After determining that Mr. Seward was eligible for his requested

22 Loan Modification, Wells Fargo offered to place Mr. Seward into a TPP.

23 Pursuant to the terms of that TPP, Mr. Seward was required to make three

24 monthly payments of approximately $1,200, the payment of which would result in

25 a permanent Loan Modification as long as his predetermined eligibility status

26 remained unchanged.

27     54.    Wells Fargo misrepresented the material terms of Mr. Seward's TPP,

28 as it represented that Mr. Seward would be given a permanent Loan Modification

00110828.000.docx

1  once he paid the required payments pursuant to the terms of his TPP (assuming
2  that his predetermined eligibility status remained unchanged).

3        55.    Mr. Seward reasonably believed that he was eligible for the Loan
4  Modification that he requested and that the Loan Modification would become
5  permanent once he made all payments required by his TPP.  Based upon that
6  reasonable belief, Mr. Seward entered into the TPP with Wells Fargo and began
7  making modified monthly mortgage payments.

8        56.    In or about December 2012, Wells Fargo sent Mr. Seward a Denial
9  Letter informing him that his Loan Modification was denied.  Although Mr.
10 Seward had made all payments required by the terms of his TPP and had not
11 experienced a change in his preexisting eligibility status, Mr. Seward's Loan
12 Modification was denied because a subordinate lienholder refused to subordinate
13 its existing lien to Mr. Seward's modified mortgage.

14       57.    In Mr. Seward's Denial Letter, Wells Fargo stated that Mr. Seward
15 did not meet the requirements of the Modification Program for which he applied.
16 As such, Mr. Seward believed that his predetermined eligibility status had
17 changed, and that this was the reason that his permanent Loan Modification was
18 denied.  Because Wells Fargo was the sole entity responsible for determining Mr.
19 Seward's eligibility for Modification Programs, Mr. Seward reasonably relied on
20 Wells Fargo's representations that his Loan Modification was denied because
21 there was a change in his predetermined eligibility status.

22       58.    However, the successful completion of the Subordination Process
23 was not a part of the agreement between Wells Fargo and Mr. Seward.  As such,
24 there had been no change in Mr. Seward's predetermined eligibility status,
25 contrary to the representations in the Denial Letter that Wells Fargo sent to Mr.
26 Seward.

27       59.    Since Mr. Seward had experienced no change in his predetermined
28 eligibility status relative to the Modification Program for which he applied and he

CLASS ACTION COMPLAINT

1  made all payments required pursuant to the terms of his TPP, Wells Fargo

2  breached the terms of Mr. Seward's TPP.

3      60.    Mr. Seward was unaware of Wells Fargo's breach of his TPP

4  because, in his Denial Letter, Wells Fargo represented that he did not meet the

5  eligibility requirements of the Modification Program for which he applied.  Put

6  another way, Mr. Seward believed that *he* was the party responsible for not

7  fulfilling the terms of the TPP, and that his Loan Modification was denied because

8  of his own failure to meet the eligibility requirements of the Modification Program

9  for which he applied.

10      61.    For similar reasons, Mr. Seward was unaware that Wells Fargo

11  misrepresented the material terms of his TPP.  By representing that the denial of

12  Mr. Seward's permanent Loan Modification was predicated upon a change in his

13  predetermined eligibility status in Mr. Seward's Denial Letter, Wells Fargo

14  actively concealed the fact that it had misrepresented the material terms of the

15  TPP to Mr. Seward.

16      62.    Had Mr. Seward been aware that his requested Loan Modification

17  would be denied if a subordinate lienholder refused to subordinate its existing lien

18  to his modified mortgage, he would not have agreed to enter into a TPP with

19  Wells Fargo.

20      63.    As a direct and proximate result of Wells Fargo's misrepresentations

21  as to the terms of the TPP and the necessity of the Subordination Process, Mr.

22  Seward was harmed because he entered into a TPP, and made payments pursuant

23  to the terms of that TPP, under the false impression that he was, and would

24  remain, eligible for a permanent Loan Modification and that the Loan

25  Modification would become permanent if he made all payments required by his

26  TPP.

27      64.    Mr. Seward was also harmed because, by virtue of making payments

28  pursuant to the terms of his TPP, he reaffirmed the debt secured by his mortgage

1  and reset the applicable statute of limitations relative to the collectability of that

2  debt.

3       65.    Specifically, prior to making payments pursuant to the terms of his

4  TPP, Mr. Seward had stopped making payments relative to his mortgage and he

5  was in default.  Thus, the statute of limitations for collectability on his mortgage

6  debt had started running. However, since Mr. Seward subsequently made

7  payments pursuant to the terms of his TPP, the applicable statute of limitations

8  relative to the collectability of his mortgage debt restarted and was extended.

9       66.    On or about March 21, 2019, Wells Fargo sent Mr. Seward a

10 Settlement Letter.

11      67.    When Mr. Seward received his Settlement Letter, it was the first time

12 he became aware that Wells Fargo had breached the terms of his TPP, and had

13 actively concealed the fact that it had misrepresented the material terms of his

14 TPP.  Up until that point, Mr. Seward believed that he had been denied a

15 permanent Loan Modification because he experienced a change in his

16 predetermined eligibility status relative to the Modification Program for which he

17 applied, and that Wells Fargo's representations regarding the terms of his TPP

18 were accurate.

19      68.    Based on the modified monthly mortgage payments Mr. Seward

20 made pursuant to the terms of his TPP, Mr. Seward paid Wells Fargo

21 approximately $3,600.  Although this does not represent the entire amount of Mr.

22 Seward's damages—as that amount will be ascertained at trial—it far exceeds the

23 $300.00 Wells Fargo offered Mr. Seward in the Settlement Letter.

24      69.    Mr. Seward desires to cash the check enclosed with the Settlement

25 Letter he received, but he is unable to do so because he does not want to fully

26 release all of his claims against Wells Fargo.

27

28

00110828.000.docx
CLASS ACTION COMPLAINT

### The Bradys

70.     At all times relevant to this action, Wells Fargo was the Servicer of the mortgage on the Bradys' jointly owned residence.

71.     In or about May 2012, the Bradys submitted a complete application to Wells Fargo to avail themselves of a Loan Modification.

72.     When the Bradys applied for their Loan Modification, they met all eligibility requirements of that Modification Program.  Accordingly, Wells Fargo sent the Bradys a letter stating that they had met all eligibility criteria relative to the Modification Program for which they applied.

73.     After the Bradys submitted their Loan Modification application to Wells Fargo, Wells Fargo sent them a letter stating that they were eligible for their requested Loan Modification, and offered to place the Bradys into a TPP. Pursuant to the terms of that TPP, the Bradys were required to make three monthly payments of approximately $1,580, the payment of which would result in a permanent Loan Modification as long as their predetermined eligibility status remained unchanged.

74.     Wells Fargo misrepresented the material terms of the Bradys's TPP, as it represented that the Bradys would be given a permanent Loan Modification once they paid the required payments pursuant to the terms of their TPP (assuming that their predetermined eligibility status remained unchanged).

75.     The Bradys reasonably believed that they were eligible for the Loan Modification that they requested and that the Loan Modification would become permanent once they made all payments required by their TPP.  Based upon that reasonable belief, the Bradys entered into the TPP with Wells Fargo and began making modified monthly mortgage payments.

76.     The Bradys ultimately made modified monthly mortgage payments for 6 months.

CLASS ACTION COMPLAINT

00110828.000.docx

77.     In or about February 2013, Wells Fargo sent the Bradys a Denial Letter informing them that their Loan Modification was denied.  Although the Bradys had made all payments required by the terms of their TPP and had not experienced a change in their preexisting eligibility status, the Bradys' Loan Modification was denied because a subordinate lienholder refused to subordinate its existing lien to the Bradys' modified mortgage.

78.     In the Bradys' Denial Letter, Wells Fargo stated that the Bradys did not meet the requirements of the Modification Program for which they applied. As such, the Bradys believed that their predetermined eligibility status had changed, and that this was the reason that their permanent Loan Modification was denied.  Because Wells Fargo was the sole entity responsible for determining the Bradys' eligibility for Modification Programs, the Bradys reasonably relied on Wells Fargo's representations that their Loan Modification was denied because there was a change in their predetermined eligibility status.

79.     However, the successful completion of the Subordination Process was not a part of the agreement between Wells Fargo and the Bradys.  As such, there had been no change in the Bradys' predetermined eligibility status, contrary to the representations in the Denial Letter that Wells Fargo sent to the Bradys.

80.     Since the Bradys had experienced no change in their predetermined eligibility status relative to the Modification Program for which they applied and they made all payments required pursuant to the terms of their TPP, Wells Fargo breached the terms of the TPP with the Bradys.

81.     The Bradys were unaware of Wells Fargo's breach of their TPP because, in their Denial Letter, Wells Fargo represented that the Bradys did not meet the eligibility requirements of the Modification Program for which they applied.  Put another way, the Bradys believed that *they* were the parties responsible for not fulfilling the terms of their TPP, and that their Loan

CLASS ACTION COMPLAINT

Modification was denied because of their own failure to meet the eligibility requirements of the Modification Program for which they applied.

82.   For similar reasons, the Bradys were unaware that Wells Fargo misrepresented the material terms of their TPP.  By representing that the denial of the Bradys' permanent Loan Modification was predicated upon a change in their predetermined eligibility status in their Denial Letter, Wells Fargo actively concealed the fact that it had misrepresented the material terms of the TPP to the Bradys.

83.   Had the Bradys been aware that their requested Loan Modification would be denied if a subordinate lienholder refused to subordinate its existing lien to their modified mortgage, they would not have agreed to enter into a TPP with Wells Fargo.

84.   As a direct and proximate result of Wells Fargo's misrepresentations as to the terms of the TPP and the necessity of the Subordination Process, the Bradys were harmed because they entered into a TPP, and made payments pursuant to the terms of that TPP, under the false impression that they were, and would remain, eligible for a permanent Loan Modification and that the Loan Modification would become permanent if they made all payments required by their TPP.

85.   The Bradys were also harmed because, by virtue of making payments pursuant to the terms of their TPP, they reaffirmed the debt secured by their mortgage and reset the applicable statute of limitations relative to the collectability of that debt.

86.   Specifically, prior to making payments pursuant to the terms of their TPP, the Bradys had stopped making payments relative to their mortgage and were in default.  Thus, the statute of limitations for collectability on their mortgage debt had started running. However, since the Bradys subsequently made

CLASS ACTION COMPLAINT

payments pursuant to the terms of their TPP, the applicable statute of limitations relative to the collectability of their mortgage debt restarted and was extended.

87. On or about April 10, 2019, Wells Fargo sent the Bradys a Settlement Letter.

88. When the Bradys received their Settlement Letter, it was the first time they became aware that Wells Fargo had breached the terms of their TPP, and had actively concealed the fact that it had misrepresented the material terms of their TPP. Up until that point, the Bradys believed that they had been denied a permanent Loan Modification because they experienced a change in their predetermined eligibility status relative to the Modification Program for which they applied, and that Wells Fargo's representations regarding the terms of their TPP was accurate.

89. Based on the modified monthly mortgage payments the Bradys made pursuant to the terms of their TPP, the Bradys paid Wells Fargo approximately $9,480. Although this does not represent the entire amount of the Bradys' damages—as that amount will be ascertained at trial—it far exceeds the $300.00 Wells Fargo offered the Bradys in the Settlement Letter.

90. The Bradys desire to cash the check enclosed with the Settlement Letter they received, but they are unable to do so because they do not want to fully release all of their claims against Wells Fargo.

## CLASS ACTION ALLEGATIONS

91. **Class Definition**: Plaintiffs bring this action pursuant to Fed R. Civ. P. 23 on behalf of a class of similarly situated individuals (the "Class"), defined as follows:

> All loan borrowers in the United States (1) who entered into a TPP with Wells Fargo, (2) whose TPP did not contain an express provision stating that they could be refused a permanent Loan Modification in the event that a subordinate lienholder refused to subordinate its existing lien to their modified mortgage, (3) who made all required payments pursuant to the terms of the TPP, and (4) who were denied permanent Loan Modifications because a subordinate

-19-

lienholder refused to subordinate its existing lien to their modified mortgage.

92.   **Minnesota Subclass Definition**: In addition to the Class defined above, Mr. Seward brings this action pursuant to Fed R. Civ. P. 23 on behalf of a subclass of similarly situated individuals from Minnesota (the "Minnesota Subclass"), defined as follows:

> All loan borrowers in Minnesota (1) who entered into a TPP with Wells Fargo, (2) whose TPP did not contain an express provision stating that they could be refused a permanent Loan Modification in the event that a subordinate lienholder refused to subordinate its existing lien to their modified mortgage, (3) who made all required payments pursuant to the terms of the TPP, and (4) who were denied permanent Loan Modifications because a subordinate lienholder refused to subordinate its existing lien to their modified mortgage.

93.   **California Subclass Definition**: In addition to the Class defined above, the Bradys bring this action pursuant to Fed R. Civ. P. 23 on behalf of a subclass of similarly situated individuals from California (the "California Subclass"), defined as follows:

> All loan borrowers in California (1) who entered into a TPP with Wells Fargo, (2) whose TPP did not contain an express provision stating that they could be refused a permanent Loan Modification in the event that a subordinate lienholder refused to subordinate its existing lien to their modified mortgage, (3) who made all required payments pursuant to the terms of the TPP, and (4) who were denied permanent Loan Modifications because a subordinate lienholder refused to subordinate its existing lien to their modified mortgage.

94.   **Numerosity and Ascertainability**: Upon information and belief, the Class is comprised of more than 40 members.  This conclusion is reasonable because Wells Fargo is one of the largest mortgage providers in the country, which, as of 2012, held approximately thirty percent (30%) of the market share for mortgages in the United States.  The Class is so numerous that joinder of all members is impractical.  The exact number of members in the Class is presently

-20-

CLASS ACTION COMPLAINT

1  unknown, can only be ascertained through discovery, and can easily be identified

2  through Defendant's records or by other means.  In fact, Wells Fargo has likely

3  already identified many Class members and is in the process of sending

4  Settlement Letters to them.

5      95.    **Commonality and Predominance**: All members of the Class have

6  been subject to and affected by a uniform course of conduct: specifically, Wells

7  Fargo misrepresenting the material terms relative to their Loan Modifications and

8  that they could be denied due to the failure of the Subordination Process.

9  Additionally, the terms of the TPPs into which Plaintiffs and Class members

10 entered were substantially similar, and were breached by Wells Fargo in the same

11 way.  Accordingly, there are questions of law and fact common to the proposed

12 Class that predominate over any individual questions.

13     96.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class.

14 The terms of Plaintiffs' and Class members' TPPs were substantially similar, were

15 breached in the same way by Wells Fargo, and caused Plaintiffs and Class

16 members to make mortgage payments that they otherwise would not have been

17 willing to make.  Therefore, Plaintiffs and Class members were all harmed in the

18 same way, and incurred damages as a result.

19     97.    **Adequacy**: Plaintiffs will adequately represent the interests of the

20 Class and do not have adverse interests to the Class. If individual Class members

21 prosecuted separate actions it may create a risk of inconsistent or varying

22 judgments that would establish incompatible standards of conduct. A class action

23 is the superior method for the quick and efficient adjudication of this controversy.

24 Plaintiffs' counsel has extensive experience litigating consumer class actions.

25                    **COUNT I**
                **Breach of Contract**
26         **(On Behalf of Plaintiffs and the Class)**

27     98.    Plaintiffs repeat and re-allege paragraphs 1-97 with the same force

28 and effect as though fully set forth herein.

00110828.000.docx

99.    After Plaintiffs and Class members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of Plaintiffs' and Class members' existing mortgages.  This offer was evidenced by, and contained within, the TPPs that Wells Fargo provided to Plaintiffs and Class members.

100.   Pursuant to the terms of the TPPs that Wells Fargo offered to Plaintiffs and Class members, Wells Fargo agreed to permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs and if their preexisting eligibility status—which had already been determined—did not change.

101.   Plaintiffs and Class members accepted Wells Fargo's offer and began making payments as required by their TPPs.

102.   Wells Fargo provided consideration to Plaintiffs and Class members in the form of its promise to permanently modify the terms of their existing mortgages once they made the payments required under their TPPs.

103.   Plaintiffs and Class members provided consideration to Wells Fargo by paying Wells Fargo in accordance with the terms of their TPPs.  Further, Plaintiffs and Class members provided Wells Fargo with financial information and verified its accuracy.  Plaintiffs and Class members gave up potential defenses to the collection of their mortgage notes because, by virtue of making payments pursuant to the terms of their TPPs, they reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

104.   Plaintiffs and Class members performed all terms required by their TPPs, as they made each payment pursuant to the terms of their TPPs and remained eligible for Loan Modifications pursuant to the terms of the applicable Modification Programs.

CLASS ACTION COMPLAINT

105.   Despite the fact that Plaintiffs and Class members fully performed all of their obligations under their TPPs, Wells Fargo did not give them permanent Loan Modifications as it had promised.

106.   Wells Fargo did not give Plaintiffs and Class members permanent Loan Modifications because subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages.  However, this was never a term of the agreements between Plaintiffs and Class members and Wells Fargo.  Thus, Wells Fargo breached the terms of the TPPs that it entered into with Plaintiffs and Class members.

107.   Plaintiffs and Class members are entitled to restitution damages in the form of all payments they made pursuant to the terms of their TPPs.

108.   In addition, because Plaintiffs and Class members reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to the terms of their TPPs, Plaintiffs and Class members seek injunctive relief to prohibit Wells Fargo from collecting those debts after the original period of collectability would have otherwise expired.

**COUNT II**
**Fraudulent Misrepresentation**
**(On Behalf of Plaintiffs and the Class)**

109.   Plaintiffs repeat and re-allege paragraphs 1-97 with the same force and effect as though fully set forth herein.

110.   After Plaintiffs and Class members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of Plaintiffs' and Class members' existing mortgages if they entered into TPPs.

111.   At the time Wells Fargo offered to place Plaintiffs and Class members into TPPs, Wells Fargo represented to Plaintiffs and Class members that it would permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs and if their

1  preexisting eligibility status—which had already been determined—did not

2  change.

3     112.   Wells Fargo knew of the necessity of the Subordination Process

4  relative to permanent Loan Modifications and knew that it would not permanently

5  modify the terms of Plaintiffs' and Class members' existing mortgages if

6  subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and

7  Class members' modified mortgages.

8     113.   Wells Fargo also knew that Plaintiffs and Class members would be

9  unwilling to enter into TPPs if their permanent Loan Modifications were

10  contingent upon the successful completion of the Subordination Process or that

11  their Loan Modifications would be denied if subordinate lienholders refused to

12  subordinate their existing liens to Plaintiffs' and Class members' modified

13  mortgages.

14     114.   As such, Wells Fargo knew that its representations regarding the

15  material terms of Plaintiffs' and Class members' TPPs were false.

16     115.   By misrepresenting the material terms of Plaintiffs' and Class

17  members' TPPs, Wells Fargo intended to induce Plaintiffs and Class members

18  into entering into agreements that they would not otherwise have been willing to

19  enter into.

20     116.   In reliance on Wells Fargo's misrepresentations, Plaintiffs and Class

21  members entered into TPPs with Wells Fargo.

22     117.   Wells Fargo's misrepresentations were part of a scheme to defraud

23  Plaintiffs and Class members. In short, Wells Fargo knew that it could secure

24  additional mortgage payments from Plaintiffs and Class members by fraudulently

25  inducing Plaintiffs and Class members to enter into TPPs with the promise that

26  their Loan Modifications would be made permanent once Plaintiffs and Class

27  members made the agreed upon payments.  However, at the time Wells Fargo

28  made that promise, Wells Fargo knew that it would not make Plaintiffs' and Class

1  members' Loan Modifications permanent once Plaintiffs and Class members

2  made the agreed upon payments if subordinate lienholders refused to subordinate

3  their existing liens to Plaintiffs' and Class members' modified mortgages.

4        118.  As a direct and proximate result of Wells Fargo's misrepresentations,

5  Plaintiffs and Class members made payments pursuant to the terms of their TPPs

6  which they would not otherwise have paid, suffered financial and emotional

7  damages, and reset the applicable statutes of limitations relative to the

8  collectability of the debts secured by their mortgages.

9        119.  Plaintiffs and Class members seek monetary damages and injunctive

10  relief to prohibit Wells Fargo from collecting those debts after the original period

11  of collectability would have otherwise expired.

**COUNT III**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201, *et seq.*)**
**(On Behalf of Plaintiffs and the Class)**

15        120.  Plaintiffs repeat and re-allege paragraphs 1-97 with the same force

16  and effect as though full set forth herein.

17        121.  After Plaintiffs and Class members submitted Loan Modification

18  applications to Wells Fargo, Wells Fargo offered to permanently modify the terms

19  of Plaintiffs' and Class members' existing mortgages.  This offer was evidenced

20  by, and contained within, the TPPs that Wells Fargo provided to Plaintiffs and

21  Class members.

22        122.  Pursuant to the terms of the TPPs that Wells Fargo offered to

23  Plaintiffs and Class members, Wells Fargo agreed to permanently modify the

24  terms of Plaintiffs' and Class members' existing mortgages once they made all

25  payments required under their TPPs and if their preexisting eligibility status—

26  which had already been determined—did not change.

27        123.  Plaintiffs and Class members accepted Wells Fargo's offer and began

28  making payments as required by their TPPs.

CLASS ACTION COMPLAINT

124.   Wells Fargo provided consideration to Plaintiffs and Class members in the form of its promise to permanently modify the terms of their existing mortgages once they made the payments required under their TPPs.

125.   Plaintiffs and Class members provided consideration to Wells Fargo by paying Wells Fargo in accordance with the terms of their TPPs.  Further, Plaintiffs and Class members provided Wells Fargo with financial information and verified its accuracy.  Plaintiffs and Class members gave up potential defenses to the collection of their mortgage notes because, by virtue of making payments pursuant to the terms of their TPPs, they reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

126.   Plaintiffs and Class members performed all terms required by their TPPs, as they made each payment pursuant to the terms of their TPPs and remained eligible for Loan Modifications pursuant to the terms of the applicable Modification Programs.

127.   Despite the fact that Plaintiffs and Class members fully performed all of their obligations under their TPPs, Wells Fargo did not give them permanent Loan Modifications as it had promised.

128.   Wells Fargo did not give Plaintiffs and Class members permanent Loan Modifications because subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages.  However, this was never a term of the agreements between Plaintiffs and Class members and Wells Fargo.  Thus, Wells Fargo breached the terms of the TPPs that it entered into with Plaintiffs and Class members.

129.   By virtue of making payments pursuant to the terms of their TPPs, Plaintiffs and Class members reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.  However, those actions were performed pursuant to the terms of a contract that was breached by Wells Fargo and should have no legal effect.

130.   Accordingly, Plaintiffs and Class members seek a declaration that they did not reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to a breached contract—*i.e.*, the TPPs—and that the applicable statutes of limitations relative to the collectability of those debts is to run from the date that Plaintiffs and Class members last made a payment prior to entering into TPPs with Wells Fargo.

131.   The controversies presented in this case are definite and concrete, and affect the adverse legal interests of the parties. Plaintiffs and Class members have a legal interest in a shorter time period relative to the collectability of the debts secured by their mortgages, and Wells Fargo has an opposing tangible legal interest in a longer time period of collectability.  This case will determine the legal rights of all parties.

132.   If the Court were to deny Plaintiffs' and Class members' request for declaratory relief, this controversy will continue to exist, as Wells Fargo will continue to assert that the period of collectability relative to the debts secured by Plaintiffs' and Class members' mortgages runs from the date when Plaintiffs and Class members last made a payment pursuant to the terms of their TPPs, and Plaintiffs and Class members will continue to assert that those payments are invalid and have no legal effect.

133.   Based on the foregoing facts, the Court should declare that the applicable statutes of limitations relative to the collectability of the debts secured by Plaintiffs' and Class members' mortgages is to run from the date that Plaintiffs and Class members last made a payment prior to entering into TPPs with Wells Fargo.

CLASS ACTION COMPLAINT

## COUNT IV
### Violation of the Minnesota Prevention of Consumer Fraud Act
### (Minn.Stat. §§ 325F.68, *et seq.*)
### (On Behalf of Mr. Seward and the Minnesota Subclass)

134.    Mr. Seward repeats and re-alleges paragraphs 1-97 with the same force and effect as though full set forth herein.

135.    The Minnesota Prevention of Consumer Fraud Act ("MPCFA") makes illegal "the act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  Minn.Stat. § 325F.69(1).

136.    Mr. Seward, Defendant, and Minnesota Subclass members are each a "person" as defined by Minn.Stat. § 325F.68(3).

137.    Mr. Seward's and Minnesota Subclass members' TPPs and mortgages constitute "merchandise" as defined by Minn.Stat. § 325F.68(2).

138.    After Mr. Seward and Minnesota Subclass members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of Mr. Seward's and Minnesota Subclass members' existing mortgages if they entered into TPPs.

139.    At the time Wells Fargo offered to place Mr. Seward and Minnesota Subclass members into TPPs, Wells Fargo represented to Mr. Seward and Minnesota Subclass members that it would permanently modify the terms of Mr. Seward's and Minnesota Subclass members' existing mortgages once they made all payments required under their TPPs and if their preexisting eligibility status— which had already been determined—did not change.

140.    Wells Fargo knew of the necessity of the Subordination Process relative to permanent Loan Modifications and knew that it would not permanently modify the terms of Mr. Seward's and Minnesota Subclass members' existing

00110828.000.docx

1  mortgages if subordinate lienholders refused to subordinate their existing liens to
2  Mr. Seward's and Minnesota Subclass members' modified mortgages.

3      141.   Wells Fargo also knew that Mr. Seward and Minnesota Subclass
4  members would be unwilling to enter into TPPs if their permanent Loan
5  Modifications were contingent upon the successful completion of the
6  Subordination Process or that their Loan Modifications would be denied if
7  subordinate lienholders refused to subordinate their existing liens to Mr. Seward's
8  and Minnesota Subclass members' modified mortgages.

9      142.   As such, Wells Fargo knew that its representations regarding the
10  material terms of Mr. Seward's and Minnesota Subclass members' TPPs were
11  false.

12      143.   By misrepresenting the material terms of Mr. Seward's and
13  Minnesota Subclass members' TPPs, Wells Fargo intended to induce Mr. Seward
14  and Minnesota Subclass members into entering into agreements that they would
15  not otherwise have been willing to enter into.

16      144.   In reliance on Wells Fargo's misrepresentations, Mr. Seward and
17  Minnesota Subclass members entered into TPPs with Wells Fargo.

18      145.   Wells Fargo's misrepresentations were part of a scheme to defraud
19  Mr. Seward and Minnesota Subclass members. In short, Wells Fargo knew that it
20  could secure additional mortgage payments from Mr. Seward and Minnesota
21  Subclass members by fraudulently inducing Mr. Seward and Minnesota Subclass
22  members to enter into TPPs with the promise that their Loan Modifications would
23  be made permanent once Mr. Seward and Minnesota Subclass members made the
24  agreed upon payments.  However, at the time Wells Fargo made that promise,
25  Wells Fargo knew that it would not make Mr. Seward's and Minnesota Subclass
26  members' Loan Modifications permanent once Mr. Seward and Minnesota
27  Subclass members made the agreed upon payments if subordinate lienholders

28

refused to subordinate their existing liens to Mr. Seward's and Minnesota Subclass members' modified mortgages.

146.   As a direct and proximate result of Wells Fargo's misrepresentations, Mr. Seward and Minnesota Subclass members made payments pursuant to the terms of their TPPs which they would not otherwise have paid, suffered financial and emotional damages, and reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

147.   In misrepresenting the terms of Mr. Seward's and Minnesota Subclass members' TPPs, Defendant violated the MPCFA.  Minn.Stat. § 325F.69(1).

148.   Pursuant to Minn.Stat. § 8.31(3a), Mr. Seward may "bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorneys' fees, and receive other equitable relief as determined by the Court."

149.   Mr. Seward's prosecution of this action will secure a public benefit because Defendant is one of the largest mortgage providers in the country, which, as of 2012, held approximately thirty percent (30%) of the market share for mortgages in the United States.  Any monetary recovery by Mr. Seward would benefit the Minnesota Subclass as a whole, especially given the fact that, at this time, Minnesota Subclass members have only been offered $300 by Defendant, which is significantly less that the amount of damages they each incurred. Moreover, Mr. Seward seeks declaratory and injunctive relief that would benefit all Minnesota Subclass members, as it would prohibit Wells Fargo from collecting the debts secured by their mortgages after the original period of collectability would have otherwise expired.

**COUNT V**
**Violation of the Minnesota Residential Mortgage Originator**
**and Servicer Licensing Act**
**(Minn.Stat. §§ 58.01, *et seq.*)**
**(On Behalf of Mr. Seward and the Minnesota Subclass)**

150.   Mr. Seward repeats and re-alleges paragraphs 1-97 with the same force and effect as though full set forth herein.

151.   The Minnesota Residential Mortgage Originator and Servicer Licensing Act ("MRMA") provides that "no person acting as a residential mortgage…servicer…shall," *inter alia*, "fail to perform in conformance with its written agreements with borrowers," or "make or cause to be made, directly or indirectly, any false, deceptive, or misleading statement or representation in connection with a residential loan transaction including, without limitation, a false, deceptive, or misleading statement or representation regarding the borrower's ability to qualify for any mortgage product."  Minn.Stat. § 58.13(1)(a)(5), (9).

152.   Mr. Seward and Minnesota Subclass members are each a "borrower" as defined by Minn.Stat. § 58.02(4).

153.   Defendant is a "servicer" as defined by Minn.Stat. § 58.02(20).

154.   After Mr. Seward and Minnesota Subclass members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of Mr. Seward's and Minnesota Subclass members' existing mortgages if they entered into TPPs.  This offer was evidenced by, and contained within, the TPPs that Wells Fargo provided to Mr. Seward and Minnesota Subclass members.

155.   Pursuant to the terms of the TPPs that Wells Fargo offered to Mr. Seward and Minnesota Subclass members, Wells Fargo agreed to permanently modify the terms of Mr. Seward's and Minnesota Subclass members' existing mortgages once they made all payments required under their TPPs and if their

1  preexisting eligibility status—which had already been determined—did not

2  change.

3      156.   Mr. Seward and Minnesota Subclass members accepted Wells

4  Fargo's offer and began making payments as required by their TPPs.

5      157.   Wells Fargo provided consideration to Mr. Seward and Minnesota

6  Subclass members in the form of its promise to permanently modify the terms of

7  their existing mortgages once they made the payments required under their TPPs.

8      158.   Mr. Seward and Minnesota Subclass members provided

9  consideration to Wells Fargo by paying Wells Fargo in accordance with the terms

10  of their TPPs.  Further, Mr. Seward and Minnesota Subclass members provided

11  Wells Fargo with financial information and verified its accuracy.  Mr. Seward and

12  Minnesota Subclass members gave up potential defenses to the collection of their

13  mortgage notes because, by virtue of making payments pursuant to the terms of

14  their TPPs, they reset the applicable statutes of limitations relative to the

15  collectability of the debts secured by their mortgages.

16      159.   Mr. Seward and Minnesota Subclass members performed all terms

17  required by their TPPs, as they made each payment pursuant to the terms of their

18  TPPs and remained eligible for Loan Modifications pursuant to the terms of the

19  applicable Modification Programs.

20      160.   Despite the fact that Mr. Seward and Minnesota Subclass members

21  fully performed all of their obligations under their TPPs, Wells Fargo did not give

22  them permanent Loan Modifications as it had promised.

23      161.   Wells Fargo did not give Mr. Seward and Minnesota Subclass

24  members permanent Loan Modifications because subordinate lienholders refused

25  to subordinate their existing liens to Mr. Seward's and Minnesota Subclass

26  members' modified mortgages.  However, this was never a term of the agreements

27  between Mr. Seward and Minnesota Subclass members and Wells Fargo.  Thus,

28

00110828.000.docx

1   Wells Fargo breached the terms of the TPPs it entered into with Mr. Seward and
2   Minnesota Subclass members.

3       162.   Accordingly, Wells Fargo violated the MRMA because it "fail[ed] to
4   perform in conformance with its written agreements with" Mr. Seward and
5   Minnesota Subclass members.  Minn.Stat. § 58.13(1)(a)(5).

6       163.   Moreover, at the time Wells Fargo offered to place Mr. Seward and
7   Minnesota Subclass members into TPPs, Wells Fargo represented to Mr. Seward
8   and Minnesota Subclass members that it would permanently modify the terms of
9   Mr. Seward's and Minnesota Subclass members' existing mortgages once they
10  made all payments required under their TPPs and if their preexisting eligibility
11  status—which had already been determined—did not change.

12      164.   Wells Fargo knew of the necessity of the Subordination Process
13  relative to permanent Loan Modifications and knew that it would not permanently
14  modify the terms of Mr. Seward's and Minnesota Subclass members' existing
15  mortgages if subordinate lienholders refused to subordinate their existing liens to
16  Mr. Seward's and Minnesota Subclass members' modified mortgages.

17      165.   Wells Fargo also knew that Mr. Seward and Minnesota Subclass
18  members would be unwilling to enter into TPPs if their permanent Loan
19  Modifications were contingent upon the successful completion of the
20  Subordination Process or that their Loan Modifications would be denied if
21  subordinate lienholders refused to subordinate their existing liens to Mr. Seward's
22  and Minnesota Subclass members' modified mortgages.

23      166.   As such, Wells Fargo knew that its representations regarding the
24  material terms of Mr. Seward's and Minnesota Subclass members' TPPs were
25  false.

26      167.   By misrepresenting the material terms of Mr. Seward's and
27  Minnesota Subclass members' TPPs, Wells Fargo intended to induce Mr. Seward

28

CLASS ACTION COMPLAINT

1  and Minnesota Subclass members into entering into agreements that they would

2  not otherwise have been willing to enter into.

3    168.    In reliance on Wells Fargo's misrepresentations, Mr. Seward and

4  Minnesota Subclass members entered into TPPs with Wells Fargo.

5    169.    Wells Fargo's misrepresentations were part of a scheme to defraud

6  Mr. Seward and Minnesota Subclass members. In short, Wells Fargo knew that it

7  could secure additional mortgage payments from Mr. Seward and Minnesota

8  Subclass members by fraudulently inducing Mr. Seward and Minnesota Subclass

9  members to enter into TPPs with the promise that their Loan Modifications would

10  be made permanent once Mr. Seward and Minnesota Subclass members made the

11  agreed upon payments.  However, at the time Wells Fargo made that promise,

12  Wells Fargo knew that it would not make Mr. Seward's and Minnesota Subclass

13  members' Loan Modifications permanent once Mr. Seward and Minnesota

14  Subclass members made the agreed upon payments if subordinate lienholders

15  refused to subordinate their existing liens to Mr. Seward's and Minnesota

16  Subclass members' modified mortgages.

17    170.    As a direct and proximate result of Wells Fargo's misrepresentations,

18  Mr. Seward and Minnesota Subclass members made payments pursuant to the

19  terms of their TPPs which they would not otherwise have paid, suffered financial

20  and emotional damages, and reset the applicable statutes of limitations relative to

21  the collectability of the debts secured by their mortgages.

22    171.    In misrepresenting the terms of Mr. Seward's and Minnesota

23  Subclass members' TPPs, Defendant violated the MRMA.  Minn.Stat. §

24  58.13(1)(a)(9).

25    172.    Pursuant to Minn.Stat. 58.18(1), Mr. Seward, individually, and on

26  behalf of the Minnesota Subclass, may recover "(1) actual, incidental, and

27  consequential damages, (2) statutory damages equal to the amount of all lender

28

00110828.000.docx

fees included in the amount of the principal of [their] residential mortgage loan[s], (3) punitive damages," and "(4) court costs and reasonable attorneys' fees."

173.   In addition, pursuant to Minn.Stat. 58.18(2) and Minn.Stat. § 8.31(3a), Mr. Seward may "bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorneys' fees, and receive other equitable relief as determined by the Court."

174.   Mr. Seward's prosecution of this action will secure a public benefit because Defendant is one of the largest mortgage providers in the country, which, as of 2012, held approximately thirty percent (30%) of the market share for mortgages in the United States.  Any monetary recovery by Mr. Seward would benefit the Minnesota Subclass as a whole, especially given the fact that, at this time, Minnesota Subclass members have only been offered $300 by Defendant, which is significantly less that the amount of damages they each incurred. Moreover, Mr. Seward seeks declaratory and injunctive relief that would benefit all Minnesota Subclass members, as it would prohibit Wells Fargo from collecting the debts secured by their mortgages after the original period of collectability would have otherwise expired.

**COUNT VI**
**Violation of the California Unfair Competition Law**
**(Cal.Bus. & Prof.Code §§ 17200, *et seq.*)**
**(On Behalf of the Bradys and the California Subclass)**

175.   The Bradys repeat and re-allege paragraphs 1-97 with the same force and effect as though fully set forth herein.

176.   Among other things, the California Unfair Competition Law ("UCL") makes unlawful fraudulent business acts or practices, and unfair, deceptive, untrue, or misleading advertising.  Cal.Bus. & Prof.Code § 17200.

177.   The Bradys, Defendant, and California Subclass members are each a "person" as defined by Cal.Bus. & Prof.Code § 17201.

178.   After the Bradys and California Subclass members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently modify the terms of the Bradys' and California Subclass members' existing mortgages if they entered into TPPs.

179.   At the time Wells Fargo offered to place the Bradys and California Subclass members into TPPs, Wells Fargo represented to the Bradys and California Subclass members that it would permanently modify the terms of the Bradys' and California Subclass members' existing mortgages once they made all payments required under their TPPs and if their preexisting eligibility status—which had already been determined—did not change.

180.   Wells Fargo knew of the necessity of the Subordination Process relative to permanent Loan Modifications and knew that it would not permanently modify the terms of the Bradys' and California Subclass members' existing mortgages if subordinate lienholders refused to subordinate their existing liens to the Bradys' and California Subclass members' modified mortgages.

181.   Wells Fargo also knew that the Bradys and California Subclass members would be unwilling to enter into TPPs if their permanent Loan Modifications were contingent upon the successful completion of the Subordination Process or that their Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the Bradys' and California Subclass members' modified mortgages.

182.   As such, Wells Fargo knew that its representations regarding the material terms of the Bradys' and California Subclass members' TPPs were false.

183.   By misrepresenting the material terms of the Bradys' and California Subclass members' TPPs, Wells Fargo intended to induce the Bradys and California Subclass members into entering into agreements that they would not otherwise have been willing to enter into.

CLASS ACTION COMPLAINT
00110828.000.docx

184.   In reliance on Wells Fargo's misrepresentations, the Bradys and California Subclass members entered into TPPs with Wells Fargo.

185.   Wells Fargo's misrepresentations were part of a scheme to defraud the Bradys and California Subclass members. In short, Wells Fargo knew that it could secure additional mortgage payments from the Bradys and California Subclass members by fraudulently inducing the Bradys and California Subclass members to enter into TPPs with the promise that their Loan Modifications would be made permanent once the Bradys and California Subclass members made the agreed upon payments.  However, at the time Wells Fargo made that promise, Wells Fargo knew that it would not make the Bradys' and California Subclass members' Loan Modifications permanent once the Bradys and California Subclass members made the agreed upon payments if subordinate lienholders refused to subordinate their existing liens to the Bradys' and California Subclass members' modified mortgages.

186.   As a direct and proximate result of Wells Fargo's misrepresentations, the Bradys and California Subclass members made payments pursuant to the terms of their TPPs which they would not otherwise have paid, suffered financial and emotional damages, and reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

187.   In misrepresenting the terms of the Bradys' and California Subclass members' TPPs, Defendant violated both the "unlawful" and "unfair" prongs of the UCL.  Cal.Bus. & Prof.Code § 17200.  Specifically, Defendant's conduct violated the "unlawful" prong of the UCL because it was independently actionable under other applicable laws, as set forth herein.  Defendant's conduct also violated the "unfair" prong of the UCL because it was immoral, unethical, unscrupulous, and substantially injurious to the Bradys and members of the California Subclass, and because the harm to the Bradys and California Subclass members strongly outweighs any benefit to Defendant or the public.

188.   The Bradys' prosecution of this action will secure a public benefit because Defendant is one of the largest mortgage providers in the country, which, as of 2012, held approximately thirty percent (30%) of the market share for mortgages in the United States.  Any monetary recovery by the Bradys would benefit the California Subclass as a whole, especially given the fact that, at this time, California Subclass members have only been offered $300 by Defendant, which is significantly less that the amount of damages they each incurred. Moreover, the Bradys seek declaratory and injunctive relief that would benefit all California Subclass members, as it would prohibit Wells Fargo from collecting the debts secured by their mortgages after the original period of collectability would have otherwise expired.

189.   In prosecuting this action for the enforcement of important rights affecting the public interest, the Bradys seek the recovery of  attorneys' fees pursuant to the California Code of Civil Procedure § 1021.5, which is available to a prevailing plaintiff who wins relief for the general public.

## COUNT VII
### Violation of the California False Advertising Law
### (Cal.Bus. & Prof.Code §§ 17500, *et seq*.)
### (On Behalf of the Bradys and the California Subclass)

190.   The Bradys repeat and re-allege paragraphs 1-97 with the same force and effect as though fully set forth herein.

191.   Among other things, the California False Advertising Law ("FAL") makes unlawful false or misleading statements made "to induce the public to enter into any obligation relating" to real property.  Cal.Bus. & Prof.Code § 17500.

192.   The Bradys, Defendant, and California Subclass members are each a "person" as defined by Cal.Bus. & Prof.Code § 17506.

193.   After the Bradys and California Subclass members submitted Loan Modification applications to Wells Fargo, Wells Fargo offered to permanently

1  modify the terms of the Bradys' and California Subclass members' existing
2  mortgages if they entered into TPPs.

3      194.   At the time Wells Fargo offered to place the Bradys and California
4  Subclass members into TPPs, Wells Fargo represented to the Bradys and
5  California Subclass members that it would permanently modify the terms of the
6  Bradys' and California Subclass members' existing mortgages once they made all
7  payments required under their TPPs and if their preexisting eligibility status—
8  which had already been determined—did not change.

9      195.   Wells Fargo knew of the necessity of the Subordination Process
10 relative to permanent Loan Modifications and knew that it would not permanently
11 modify the terms of the Bradys' and California Subclass members' existing
12 mortgages if subordinate lienholders refused to subordinate their existing liens to
13 the Bradys' and California Subclass members' modified mortgages.

14     196.   Wells Fargo also knew that the Bradys and California Subclass
15 members would be unwilling to enter into TPPs if their permanent Loan
16 Modifications were contingent upon the successful completion of the
17 Subordination Process or that their Loan Modifications would be denied if
18 subordinate lienholders refused to subordinate their existing liens to the Bradys'
19 and California Subclass members' modified mortgages.

20     197.   As such, Wells Fargo knew that its representations regarding the
21 material terms of the Bradys' and California Subclass members' TPPs were false.

22     198.   By misrepresenting the material terms of the Bradys' and California
23 Subclass members' TPPs, Wells Fargo intended to induce the Bradys and
24 California Subclass members into entering into agreements that they would not
25 otherwise have been willing to enter into.

26     199.   In reliance on Wells Fargo's misrepresentations, the Bradys and
27 California Subclass members entered into TPPs with Wells Fargo.

28

CLASS ACTION COMPLAINT

200.   Wells Fargo's misrepresentations were part of a scheme to defraud the Bradys and California Subclass members. In short, Wells Fargo knew that it could secure additional mortgage payments from the Bradys and California Subclass members by fraudulently inducing the Bradys and California Subclass members to enter into TPPs with the promise that their Loan Modifications would be made permanent once the Bradys and California Subclass members made the agreed upon payments.  However, at the time Wells Fargo made that promise, Wells Fargo knew that it would not make the Bradys' and California Subclass members' Loan Modifications permanent once the Bradys and California Subclass members made the agreed upon payments if subordinate lienholders refused to subordinate their existing liens to the Bradys' and California Subclass members' modified mortgages.

201.   As a direct and proximate result of Wells Fargo's misrepresentations, the Bradys and California Subclass members made payments pursuant to the terms of their TPPs which they would not otherwise have paid, suffered financial and emotional damages, and reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

202.   In misrepresenting the terms of the Bradys' and California Subclass members' TPPs, Defendant violated the FAL.  Cal.Bus. & Prof.Code § 17500.

203.   The Bradys' prosecution of this action will secure a public benefit because Defendant is one of the largest mortgage providers in the country, which, as of 2012, held approximately thirty percent (30%) of the market share for mortgages in the United States.  Any monetary recovery by the Bradys would benefit the California Subclass as a whole, especially given the fact that, at this time, California Subclass members have only been offered $300 by Defendant, which is significantly less that the amount of damages they each incurred. Moreover, the Bradys seek declaratory and injunctive relief that would benefit all California Subclass members, as it would prohibit Wells Fargo from collecting the

1    debts secured by their mortgages after the original period of collectability would

2    have otherwise expired.

3        204.   In prosecuting this action for the enforcement of important rights

4    affecting the public interest, the Bradys seek the recovery of attorneys' fees

5    pursuant to the California Code of Civil Procedure § 1021.5, which is available to

6    a prevailing plaintiff who wins relief for the general public.

7                                **COUNT VIII**
                   **Violation of the Rosenthal Fair Debt Collection Practices Act**
8                              **(Cal. Civil Code §§ 1788, *et seq.*)**
                   **(On Behalf of the Bradys and the California Subclass)**
9

10       205.   The Bradys repeat and re-allege paragraphs 1-97 with the same force

11   and effect as though fully set forth herein.

12       206.   Among other things, the Rosenthal Fair Debt Collection Practices

13   Act ("Rosenthal Act") makes unlawful false, deceptive, or misleading statements

14   made in connection with the collection of any debt.  Cal. Civil Code § 1788.17

15   (incorporating the provisions of, *inter alia*, 15 U.S.C. § 1692e); 15 U.S.C. § 1692e

16   (making illegal "any false, deceptive, or misleading representation or means in

17   connection with the collection of any debt").

18       207.   The Bradys, Defendant, and California Subclass members are each a

19   "person" as defined by Cal. Civil Code § 1788.2(g).

20       208.   Defendant is a "debt collector" as defined by Cal. Civil Code §

21   1788.2(c).

22       209.   After the Bradys and California Subclass members submitted Loan

23   Modification applications to Wells Fargo, Wells Fargo offered to permanently

24   modify the terms of the Bradys' and California Subclass members' existing

25   mortgages if they entered into TPPs.

26       210.   When it offered the Bradys and California Subclass members TPPs,

27   Wells Fargo was engaged in "debt collection" as defined by Cal. Civil Code §

28   1788.2(b).  Indeed, the TPPs that Wells Fargo offered to the Bradys and California

-41-

00110828.000.docx

Subclass members, and the circumstances under which they were offered, were substantially similar to those present in *Corvello*, where the Ninth Circuit held that "Wells Fargo was engaged in debt collection" as defined by the Rosenthal Act. *Corvello*, 728 F.3d at 885.

211.  At the time Wells Fargo offered to place the Bradys and California Subclass members into TPPs, Wells Fargo represented to the Bradys and California Subclass members that it would permanently modify the terms of the Bradys' and California Subclass members' existing mortgages once they made all payments required under their TPPs and if their preexisting eligibility status— which had already been determined—did not change.

212.  Wells Fargo knew of the necessity of the Subordination Process relative to permanent Loan Modifications and knew that it would not permanently modify the terms of the Bradys' and California Subclass members' existing mortgages if subordinate lienholders refused to subordinate their existing liens to the Bradys' and California Subclass members' modified mortgages.

213.  Wells Fargo also knew that the Bradys and California Subclass members would be unwilling to enter into TPPs if their permanent Loan Modifications were contingent upon the successful completion of the Subordination Process or that their Loan Modifications would be denied if subordinate lienholders refused to subordinate their existing liens to the Bradys' and California Subclass members' modified mortgages.

214.  As such, Wells Fargo knew that its representations regarding the material terms of the Bradys' and California Subclass members' TPPs were false.

215.  By misrepresenting the material terms of the Bradys' and California Subclass members' TPPs, Wells Fargo intended to induce the Bradys and California Subclass members into entering into agreements that they would not otherwise have been willing to enter into.

CLASS ACTION COMPLAINT

00110828.000.docx

216.   In reliance on Wells Fargo's misrepresentations, the Bradys and California Subclass members entered into TPPs with Wells Fargo.

217.   Wells Fargo's misrepresentations were part of a scheme to defraud the Bradys and California Subclass members. In short, Wells Fargo knew that it could secure additional mortgage payments from the Bradys and California Subclass members by fraudulently inducing the Bradys and California Subclass members to enter into TPPs with the promise that their Loan Modifications would be made permanent once the Bradys and California Subclass members made the agreed upon payments.  However, at the time Wells Fargo made that promise, Wells Fargo knew that it would not make the Bradys' and California Subclass members' Loan Modifications permanent once the Bradys and California Subclass members made the agreed upon payments if subordinate lienholders refused to subordinate their existing liens to the Bradys' and California Subclass members' modified mortgages.

218.   As a direct and proximate result of Wells Fargo's misrepresentations, the Bradys and California Subclass members made payments pursuant to the terms of their TPPs which they would not otherwise have paid, suffered financial and emotional damages, and reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages.

219.   In misrepresenting the terms of the Bradys' and California Subclass members' TPPs, Defendant violated the Rosenthal Act.  Cal. Civil Code § 1788.17 (incorporating 15 U.S.C. § 1692e).  Accordingly, the Bradys and California Subclass members seek monetary damages and injunctive relief to prohibit Wells Fargo from collecting those debts after the original period of collectability would have otherwise expired.

CLASS ACTION COMPLAINT

00110828.000.docx

**COUNT IX**
**Violation of the Consumer Fraud and Deceptive Trade Practices Acts**
**of All 50 States and the District of Columbia**
**(On Behalf of Plaintiffs and the Class)**

220.   Plaintiffs repeat and re-allege paragraphs 1-97 with the same force and effect as though full set forth herein.

221.   Plaintiffs bring this Count individually, and on behalf of all similarly situated residents of each of the 50 states and the District of Columbia (*i.e.*, the Class) for violations of the respective statutory consumer protection laws, as follows:

a.   the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8–19–1, *et seq.*;

b.   the Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, *et seq.*;

c.   the Arizona Consumer Fraud Act, A.R.S §§ 44-1521, *et seq.*;

d.   the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101, *et seq.*;

e.   the Colorado Consumer Protection Act, C.R.S.A. § 6-1-101, *et seq.*;

f.   the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110a, *et seq.*;

g.   the Delaware Consumer Fraud Act, 6 Del. C. § 2511, *et seq.*;

h.   the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

i.   the Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, *et seq.*;

j.   the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

k.   the Hawaii Unfair Competition Law, H.R.S. § 480-1, *et seq.*;

l.   the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

m.    the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq*.;

n.    the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq*.;

o.    The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, *et seq*.;

p.    the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq*.;

q.    the Kentucky Consumer Protection Act, KRS 367.110, *et seq*.;

r.    the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq*.;

s.    the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq*.;

t.    the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq*.;

u.    the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq*.;

v.    the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq*.;

w.    the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq*.;

x.    the Missouri Merchandising Practices Act, V.A.M.S. § 407.010, *et seq*.;

y.    the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq*.;

z.    the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq*.;

aa.    the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq*.;

bb.    the New Hampshire Regulation of Business Practices for Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq*.;

cc.    the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq.*;

dd.    the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, *et seq.*;

ee.    the New York Consumer Protection from Deceptive Acts and Practices, N.Y. GBL (McKinney) § 349, *et seq.*;

ff.    the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.*;

gg.    the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, *et seq.*;

hh.    the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq.*;

ii.    the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq.*;

jj.    the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.*;

kk.    the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

ll.    the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq.*;

mm.    the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq.*;

nn.    the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq.*;

oo.    the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.*;

pp.    the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq.*;

qq.    the Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq.*;

rr.    the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

ss.    the Virginia Consumer Protection Act of 1977, VA ST § 59.1-

CLASS ACTION COMPLAINT

196, *et seq.*;

tt.    the Washington Consumer Protection Act, RCWA 19.86.010, *et seq.*;

uu.    the West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A-1-101, *et seq.*;

vv.    the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100, *et seq.*; and

ww.    the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq*.

222.   Loan Modifications are consumer goods or services.

223.   Wells Fargo engaged, and still engages, in unfair and deceptive acts or practices when, in marketing and selling Loan Modifications, Wells Fargo misrepresented to Plaintiffs and Class members that it would permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs, as alleged above.

224.   Wells Fargo intended that Plaintiffs and the members of the Class rely upon Wells Fargo's misrepresentations and omissions concerning whether Wells Fargo would permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs, as alleged above.

225.   Wells Fargo's misrepresentations and omissions possess the tendency or capacity to mislead and create the likelihood of deception.

226.   The above-described deceptive and unfair acts and practices were used or employed in the conduct of trade or commerce, namely, the marketing and sale of Loan Modifications to Plaintiffs and Class members.

227.   The above-described deceptive and unfair acts offend public policy and cause substantial injury to consumers.

228.   Plaintiffs and the Class members relied upon Wells Fargo's misrepresentations and omissions described above.

229.   Acting as reasonable consumers, had Plaintiffs and the Class members known that the Loan Modifications that they requested would be denied if subordinate lienholders refused to subordinate their existing liens to the modified mortgages, they would not have agreed to enter into TPPs with Wells Fargo. The necessity of the Subordination Process was a material term to Plaintiffs and Class members.

230.   Plaintiffs and Class members could not have reasonably avoided the injuries suffered by entering into TPPs with Wells Fargo because it was reasonable for Plaintiffs and Class members to rely on Defendant's misrepresentations and omissions.

231.   As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiffs and the members of the Class have suffered damages in the form of all payments they made pursuant to the terms of their TPPs.

232.   In addition, because Plaintiffs and Class members reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to the terms of their TPPs, Plaintiffs and Class members seek injunctive relief to prohibit Wells Fargo from collecting those debts after the original period of collectability would have otherwise expired.

233.    The injury suffered by consumers as a result of Wells Fargo's unfair and unlawful conduct is substantial because consumers unknowingly made payments to Wells Fargo pursuant to the terms of their TPPs, and reset the applicable statutes of limitations relative to the collectability of the debts secured by their mortgages by virtue of making payments pursuant to the terms of their TPPs.

234.   The substantial injury to consumers outweighs any benefit to consumers or competition that may result from Defendant's misrepresentations regarding their Loan Modifications.

235.   Plaintiffs and Class members seek monetary damages and injunctive relief to prohibit Wells Fargo from collecting those debts after the original period of collectability would have otherwise expired.

**COUNT X**
**Unjust Enrichment/Restitution**
**(In the Alternative to Count I)**
**(On Behalf of Plaintiffs and the Class)**

236.   Plaintiffs repeat and re-allege paragraphs 1-97 with the same force and effect as though full set forth herein.

237.   Wells Fargo has been unjustly enriched to Plaintiffs' and the Class members' detriment as a result of its unlawful and wrongful retention of money conferred by Plaintiffs and the Class members who were unaware that Wells Fargo would not make Plaintiffs' and Class members' Loan Modifications permanent once Plaintiffs and Class members made the agreed upon payments if subordinate lienholders refused to subordinate their existing liens to Plaintiffs' and Class members' modified mortgages, such that Defendant's retention of their money would be inequitable.

238.   Defendant's unlawful and wrongful acts, including representing to Plaintiffs and Class members that it would permanently modify the terms of Plaintiffs' and Class members' existing mortgages once they made all payments required under their TPPs, as alleged above, enabled Defendant to unlawfully receive monies it would not have otherwise obtained.

239.   Plaintiffs and the Class members have conferred benefits on Defendant, which Defendant has knowingly accepted and retained.

00110828.000.docx

240.   Defendant's retention of the benefits conferred by Plaintiffs and the Class members would be against fundamental principles of justice, equity, and good conscience.

241.   Based on the foregoing, Plaintiffs and the Class members have been injured in an amount to be determined at trial.

242.   Plaintiffs and the Class members seek to disgorge Defendant's unlawfully retained profits and other benefits resulting from its unlawful conduct, and seek restitution and rescission for the benefit of Plaintiffs and the Class members.

243.   Plaintiffs and the Class members are entitled to the imposition of a constructive trust upon Defendant, such that its unjustly retained profits and other benefits are distributed equitably by the Court to and for the benefit of Plaintiffs and the Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joshua Seward, individually, and on behalf of the Class, prays for an Order as follows:

A.   Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class (and all related Subclasses) defined herein;

B.   Designating Plaintiffs as representatives of the Class (and all related Subclasses) and their undersigned counsel as Class Counsel;

C.   Entering judgment in favor of Plaintiffs and the Class (and all related Subclasses) and against Defendant as to each and every Count, as applicable;

D.   Awarding Plaintiffs and the Class (and all related Subclasses) damages in an amount to be determined at trial as to each and every Count, as applicable;

E.   Declaring that Plaintiffs and Class members did not reset the applicable statutes of limitations relative to the collectability of

CLASS ACTION COMPLAINT

the debts secured by their mortgages by virtue of making payments pursuant to a breached contract—*i.e.*, the TPPs—and that the applicable statutes of limitations relative to the collectability of those debts is to run from the date that Plaintiffs and Class members last made a payment prior to entering into TPPs with Wells Fargo;

F.   Granting Plaintiffs and the Class injunctive relief to prohibit Wells Fargo from collecting their debts after the original period of collectability would have otherwise expired;

G.   Granting Plaintiffs and the Class appropriate equitable and declaratory relief to (1) prevent Wells Fargo from sending misleading and coercive communications with settlement offers to absent Class members, (2) require Wells Fargo to provide corrective notice to Class members who received Settlement Letters, and/or (3) ensure that Plaintiffs and Class members from across the country do not waive their right to recover damages in this action in the event that they cash the checks that Wells Fargo sent with the Settlement Letters;

H.   Awarding Plaintiffs and the Class (and all related Subclasses) attorneys' fees and costs, including interest thereon, as allowed or required by law; as to each and every Count, as applicable; and

I.   Granting all such further and other relief as this Court deems just and appropriate.

## **<u>JURY TRIAL DEMAND</u>**

Plaintiffs hereby request a trial by jury on all issues so triable.

DATED:  May 23, 2019                    **GREEN & NOBLIN, P.C.**


By:  ___/s/ Robert S. Green_____
        Robert S. Green

2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

CLASS ACTION COMPLAINT

James Robert Noblin
4500 East Pacific Coast Highway, Fourth Floor
Long Beach, CA  90804
Telephone:  (562) 391-2487
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

Thomas A. Zimmerman, Jr. (*pro hac vice submitted*)
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, IL  60602
Telephone:  (312) 440-0020
Facsimile:  (312) 440-4180
Email:        tom@attorneyzim.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

00110828.000.docx